# EXHIBIT B

**IN THE COURT OF COMMON PLEAS**
**MONTOUR COUNTY, PENNSYLVANIA**

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** Plaintiff | |
| vs. | No. CV#332-2020 |
| **$36,000.00 U.S. CURRENCY, EIGHT (8) CASES OF SILVER COIN BULLION, TWO (2) CARDBOARD BOXES OF SILVER COINS, AND BRIEFCASE OF MISCELLANEOUS JEWELRY,** Defendant | |

## PETITION FOR FORFEITURE AND CONDEMNATION

COMES NOW, the Attorney General of the Commonwealth of Pennsylvania, Josh Shapiro, by and through Andrew J. Jarbola, Deputy Attorney General, pursuant to and under authority of the provisions of the Judicial Code, Chapter 58, Forfeiture of Assets, Section 5802, 42 Pa.C.S.A. §5801 et seq. (hereinafter referred to as "Act") and petitions this Honorable Court setting forth a right of possession in and requesting an Order of Forfeiture for $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, and in support thereof avers as follows:

1. Your affiant is Trooper Jeffrey L. Brock of the Pennsylvania State Police.

2. The defendant/property, $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, was seized by the Commonwealth pursuant to the "Act."

3. The defendant/property, $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, was seized at or about 12:18 PM on Monday, February 17, 2020.

4. The defendant/property, $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, was seized on Interstate 80 eastbound at approximately mile marker 224, Valley Township, Montour County, Pennsylvania.

5. The owner and/or possessor of the defendant/property, $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, based upon all information currently available, is Michael Goodman Schifter, 50 Leggett Place, Staten Island, New York.

6. At the time of seizure, on the date and at the place of seizure, hereinbefore mentioned, the defendant/property, $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, was in the possession of Michael Goodman Schifter, 50 Leggett Place, Staten Island, New York.

7. The defendant/property is subject to forfeiture and condemnation and no legal right, title or interest exists in it by any owners or possessors of it pursuant to Section 5802 of the "Act," 42 Pa.C.S.A. Section 5802, (relating to loss of property rights to the Commonwealth), based upon the following averments of material facts:

a. On Monday, February 17, 2020, at approximately 12:18 PM, Corporal Mark Conrad was on stationary patrol on Interstate 80 eastbound near mile marker 224, Valley Township, Montour County, and was positioned in a center crossover facing eastbound traffic in a marked patrol vehicle. At this time, Trooper Christopher Isbitski informed Corporal Conrad that he observed a white RV, bearing Washington registration BBR-3672, fail to move from the right lane into the left lane as required by 75 Pa.C.S.A. §3327, duty of driver in emergency response areas. Corporal Conrad then observed the RV traveling eastbound toward his position.

b. Corporal Conrad observed the RV abruptly slow from traveling with the flow of traffic, and observed it began to travel well below the speed limit, with several

cars passing it. As the RV passed Corporal Conrad's location, it maintained traveling at a speed much slower than other traffic and continued to be passed. Given the observed traffic violation by Trooper Isbitski, Corporal Conrad pursued the RV and initiated his emergency equipment. The RV put on a right turn signal, but did not pull over, even though a large pull-off was available. Instead, the RV continued for a significant distance before finally pulling off to the shoulder.

c. Once the RV finally stopped, Corporal Conrad approached on the passenger side and made contact with the driver, who was subsequently identified by a New York driver's license as Michael Goodman Schifter. Corporal Conrad requested the required documents and inquired as to where Schifter obtained the RV. Schifter related he rented it in Las Vegas, and went on to state that it was a one-way rental. Corporal Conrad also noticed several dogs were barking inside the RV. As such, the Corporal asked Schifter to exit to speak with him.

d. When asked if he had a rental agreement for the RV, Schifter said he did not know and that they only gave him a booklet. Corporal Conrad then asked Schifter to accompany him to the passenger window of his patrol cruiser while he ran computer checks.

e. Once at the passenger window, Schifter again related that the RV was a one-way rental, and that he was dropping it off in New Jersey. He went on to state that he went to "Vegas" to try and make a living but got "slaughtered." When asked what he does, Schifter claimed he has engraving machines to engrave plaques and trophies. Corporal Conrad then explained the reasons for the stop, and asked Schifter about his work in Las Vegas.

f. Schifter stated he arrived in Las Vegas on September 19, 2019, and that he "has a corporation out there." He claimed he tried to move into a mall, but due to expensive permits, he was unable to do so. He stated he talked to his parents and they told him to move back home to New York and that they will "help" him. When asked what he will do in New York, Schifter stated he did not know. He claimed his father has "some things lined up", but he did not know. Corporal

Conrad again asked Schifter if he worked in Las Vegas, and he admitted he did nothing for work. He only stated that he "got incorporated" but was unable to find work. He also stated he did not own a place in Vegas, but rented a place with the option to buy. He said his lease was about to run out so he was returning home to New York.

g. Schifter advised that his passenger, who was later identified by a California identification card as Rosanita Lopez de Estrada, is his girlfriend that he met on a dating site. He claimed they met on New Year's Eve and have been together since. When asked what she planned to do for work, Schifter said he did not know, but said she might also work with his father. Schifter went on to claim that they know a person that is selling a gift shop so they may buy all the inventory. He advised that Lopez de Estrada currently works doing modeling and "other side work."

h. Schifter went on to explain that he could not sell his house in New York and was at risk of losing it, so that was why he actually decided to move back. As he advised his father had "some things lined up," Schifter was asked if his father works. Schifter stated his father is disabled, but claimed he does some work on the computer. Schifter was not clear on what his father did, but stated his father primarily watches television and works on the computer.

i. Corporal Conrad then asked Schifter what he did for income while in Las Vegas, and he replied, "Zero, I made zero money." Schifter explained, again, that he "got incorporated" but did not work and made "zero."

j. Corporal Conrad pulled up Schifter's criminal history and discovered he was previously arrested in Pennsylvania for forgery and theft; was arrested in New Jersey for marijuana possession and sale, shoplifting, and possession of an unlawful weapon; and was arrested in New York for obstruction of governmental administration. When asked if he was ever arrested, Schifter claimed it was a long time ago and was for nothing serious and was all "nonsense." He immediately tried to change the conversation and claimed he grew up and wants to start a family.

He also advised that all of his credit card payments are getting declined, and that all his credit cards are maxed out.

k. Around this time, Trooper Isbitski, who had arrived on scene to assist and was speaking with Lopez de Estrada at the passenger window of the RV, approached Corporal Conrad's patrol vehicle and provided Schifter with a coat. Corporal Conrad then spoke with Trooper Isbitski, who advised that Lopez de Estrada appeared overly nervous and could not provide specific travel details. Trooper Isbitski also related that she did not seem to know Schifter well, did not know Schifter's last name, actually said they broke up the night before, and she did not know the names of any of Schifter's dogs. Trooper Isbitski indicated, based on his training and experience, that he was suspicious of their travel.

l. Ultimately, during the interaction with Schifter, Corporal Conrad did not believe Schifter was being truthful when questioned regarding finances, income, and work. Schifter's demeanor changed when responding and he began to ramble and only provided vague answers. Additionally, when asked about his criminal history, Schifter downplayed his criminal past and quickly changed the conversation. As such, given the numerous indicators of criminal activity observed, combined with Trooper Isbitski's observations, Corporal Conrad believed Schifter was on a criminal voyage. As such, Corporal Conrad asked Schifter for consent to search the RV. Schifter stated he didn't want the trooper to search and claimed it was due to his dogs. Corporal Conrad then asked Schifter if he would consent to a search if his dogs were not an issue. Shifter again stated he would not consent to a search.

m. After having Lopez de Estrada exit, Corporal Conrad conducted an exterior sniff scan of the RV with his Drug-Detection K9 Astor. K9 Astor displayed alert behavior at the front and passenger side of the RV, indicating the presence of odors of controlled substances. As such, Corporal Conrad advised Schifter he would be conducting a probable cause search of the RV.

n. Corporal Conrad went to the passenger side cargo doors, and observed they were all locked. The Corporal asked Schifter if he had been in the locked cargo area, and Schifter lied and claimed he had not been in there. During the probable cause search, Trooper Isbitski located bulk U.S. currency and several cases of silver coins in the storage compartment towards the front of the RV that was below the living space on the passenger side of the RV. A briefcase containing jewelry was also discovered in the rear storage compartment of the RV, below the living space. Schifter advised Trooper Isbitski that the currency was his and totaled $20,000. Schifter also stated the silver was his.

o. Corporal Conrad then viewed the currency, silver and jewelry. It appeared the currency was in four (4) $10,000 stacks, and certainly appeared to be more than $20,000. There were eight (8) green plastic U.S. Mint cases containing sleeves of silver bullion coins inside plastic sleeves. There were also two (2) cardboard boxes containing sleeves of silver bullion coins, along with a briefcase containing various items of jewelry.

p. Corporal Conrad noted how odd it was for Schifter to have such a large amount of cash and silver, especially in light of Schifter's admissions that he was "slaughtered" in Las Vegas, had "zero" work in Las Vegas, was at risk of losing his house in New York, that all of his credit card payments were getting declined, and that all of his credit cards were maxed out. Ultimately, the cash and silver were seized for further investigation given the criminal indicators observed. The items were transported to PSP-Milton, and Schifter was advised he could accompany the troopers to the barracks or receive a receipt for the property.

q. Once Corporal Conrad arrived back at PSP-Milton, he was informed that Schifter was in the lobby and was continuously calling 911 to report that his items had been stolen. Corporal Conrad went to speak with Schifter and tried to explain the investigative process, and also asked Schifter to stop calling 911 for his non-emergency purposes. Corporal Conrad inquired as to how and where Schifter obtained the currency, silver, and jewelry. Schifter stated that the items were his.

He then advised that he purchased the cases of silver periodically over the past few months at Nevada Coin and Jewelry. He never stated where the currency came from. When asked if he had any receipts, he said he did not and claimed that receipts were not provided to people when they buy bulk silver. Schifter could not provide any further details, but asked for the station's fax number to provide receipts.

r. Corporal Conrad then conducted a cash scan of the seized currency with K9 Astor. K9 Astor displayed alert and indication behavior to one of, or any combination of, the controlled substances he has been trained to detect as being on the suspect currency. As such, the currency was seized and Schifter was provided with a receipt as required.

s. On February 17, 2020, Corporal Conrad conducted an E.P.I.C. check, which revealed Schifter was a subject of a federal investigation in 1998. The case involved Schifter possessing counterfeit currency.

t. On February 18, 2020, Corporal Conrad contacted Nevada Coin and Jewelry and spoke with the manager. The manager advised Schifter contacted him to fax receipts to the Milton barracks, which he did. The manager related he does not know Schifter personally, but said he is familiar with him as a customer that often purchases bulk silver. Corporal Conrad asked the manager for any details of Schifter's purchases. The manager related that Schifter always pays in cash. He stated they do not request customer's names or identification for smaller purchases, but if a purchase reaches several hundred dollars, they may start to ask "some questions" and request a name. He said they are only required to obtain identification and initiate further reporting procedures if a silver purchase meets or exceeds $10,000. He related that Schifter's purchases were all under the $10,000 limit. He stated that, although purchases like that occasionally occur, they do not happen often. Lastly, he related that the green cases of silver coins are referred to as Monster Boxes, are obtained directly from the U.S. Mint and typically

contain 500 one-ounce silver coins, and they sell for approximately $10,000 per case depending on the daily price of silver.

u. A review of the receipts received from Nevada Coin and Jewelry show that Schifter made eight (8) purchases from October 17, 2019, through December 19, 2019, with purchases occurring on consecutive days, or a few days apart, to stay under the $10,000 reporting requirement. Specifically, the sales included the following dates and amounts:

(1) October 17, 2019 - "Rose Estrada" purchased 500 one-ounce silver bullion for $9,370;

(2) October 18, 2019 - "Mike Schifter" purchased 200 one-ounce silver bullion for $4,623;

(3) November 12, 2019 - "Michael Shifter" purchased 500 one-ounce silver bullion for $8,750;

(4) November 22, 2019 - "Michael Shifter" purchased 500 one-ounce silver bullion for $9,525;

(5) November 25, 2019 - "Michael Shifter" purchased 350 one-ounce silver bullion for $5,925;

(6) December 6, 2019 - "Michael Shifter" purchased 500 one-ounce silver bullion for $9,450;

(7) December 13, 2019 - "Michael Shifter" purchased 500 one-ounce silver bullion for $9,275; and

(8) December 19, 2019 - "Mike Schifter" purchased 400 one-ounce silver bullion for $7,986.

v. Ultimately, at a time when Schifter admitted he was "slaughtered" in Las Vegas, had "zero" work in Las Vegas, was at risk of losing his house in New York, that all of his credit card payments were getting declined, and that all of his credit cards were maxed out, he purchased 3,450 one-ounce silver bullion coins for a total of $64,904.00 in cash.

w. On February 19, 2020, Corporal Conrad received information from a reliable confidential source that Schifter was engaging in structuring and money laundering activities through various bank accounts of his at several different banks. It was learned that Schifter would provide several different supposed occupations for himself to support his money laundering activities, to include owner of Gold Manufacturing Co.; self-employed jeweler; self-employed; acupuncture addiction specialist; owner of Bali Jewelers, Inc.; owner of Schifter Services; Gold Engraving Manufacture, Co.; and woodworking. Additionally, it was also learned that Schifter received a $1,000,000.00 loan on January 26, 2019, for his residence at 50 Legget Place, State Island.

x. On March 11, 2020, the undersigned and Corporal Conrad received loan documentation from Schifter's attorney, Jeana Longo, Esquire. Based upon a review of the documentation, it is believed, and therefore averred, that the loan was another way for Schifter to launder money. Specifically, the documents show Schifter obtained a $350,000.00 loan from a James and Lauri Quigney on or about September 11, 2019. The term of the loan/promissory note was for only thirteen (13) months, and required Schifter to pay $2,770.83 each month until, and including, September 11, 2020. Schifter would then have to pay a lump sum/balloon payment of $350,000.00 on October 11, 2020. Again, these payments, and the lump $350,000 payment were to be occurring during a time when Schifter stated he was "slaughtered" in Las Vegas, had "zero" work in Las Vegas, was at risk of losing his house in New York, that all of his credit card payments were getting declined, and that all of his credit cards were maxed out.

y. Lastly, after departments re-opened following the state of emergency during the pandemic, on May 14, 2020, National Guard SFC Kimberly Boltz conducted an ion scan of the seized bulk currency. The scan alarmed for high levels of methamphetamine. Methamphetamine does not have a casual contact level as it does not appear in sufficient quantities on currency in general circulation. As such, the high alarm indicates the currency was recently in close

contact with methamphetamine. Following the scan, the currency was counted and totaled $36,000.00 U.S. currency.

8. The defendant/property, $36,000.00 U.S. currency, eight (8) cases of silver coin bullion, two (2) cardboard boxes of silver coins, and briefcase of miscellaneous jewelry, was furnished or intended to be furnished by any person in exchange for a controlled substance, in violation of the Controlled Substance, Drug, Device, and Cosmetic Act, or, is proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of said Act, or is otherwise subject to forfeiture under the "Act."

WHEREFORE, the Commonwealth through the Attorney General prays this Honorable Court to issue an Order that the defendant/property be condemned and adjudged forfeited to the Commonwealth and that all right, title or interest in the defendant/property, except that vested in the Office of Attorney General, Commonwealth of Pennsylvania, be declared null and void and that the property be used or disposed of in accordance with law.

Respectfully submitted,

Josh Shapiro
Attorney General of the
Commonwealth of Pennsylvania

By: Andrew Jarbola IV
Andrew J. Jarbola, IV
Deputy Attorney General
Attorney I.D. #314659
Office of Attorney General
2515 Green Tech Drive
State College, PA 16803
(814) 863-6503

**VERIFICATION**

I, Trooper Jeffrey L. Brock of the Pennsylvania State Police, hereby affirm that the statements contained in the foregoing Petition for Forfeiture and Condemnation are true and correct to the best of my knowledge, information, and belief. This verification is made subject to the penalties of 18 Pa.C.S.A. §4904 (relating to unsworn falsification to authorities).

Trooper Jeffrey L. Brock
Pennsylvania State Police

10/7/20
Date

**CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Andrew J. Jarbola, IV

Signature: Andrew Jarbola IV

Name: Andrew J. Jarbola, IV

Attorney No. (if applicable): 314659